In the Supreme Court of Georgia

Decided:    June 20, 2016

S16A0027.  MARCHMAN v. THE STATE.
S16A0028.  ARNOLD v. THE STATE.

BENHAM, Justice.

Appellants Joshua Marchman and Joshua Arnold were involved, along

with another perpetrator, in a crime spree on the evening of July 9 into the

morning hours of July 10, 2009, that resulted in the shooting deaths of Nicholas

Garner and Lateisha Weatherspoon. Appellants were tried jointly before a jury

and both were found guilty of the crimes with which they were charged,

including two counts of malice murder.[1]  We affirm the convictions for the

    [1] The crimes occurred on July 9 and July 10, 2009.  On March 30, 2012, a Cobb County grand jury returned a single indictment naming both Marchman and Arnold, charging appellants jointly as follows:  (Count 1) malice murder of Nicholas Garner; (Count 2) malice murder of Lateisha Weatherspoon;  (Count 3) felony murder (aggravated assault) of Nicholas Garner;  (Count 4) felony murder (aggravated assault) of Lateisha Weatherspoon;  (Count 9) kidnapping with bodily injury of Lateisha Weatherspoon; (Count 10) kidnapping with bodily injury of Dimitri Hunter; (Count 11) kidnapping of Shanice Green; (Count 12) aggravated assault of Nicholas Garner; (Count 13) aggravated assault of Lateisha Weatherspoon; (Count 14) aggravated assault of Shanice Green; (Count 15) aggravated assault of Dimitri Hunter; (Count 16) aggravated assault of Aaron Garner; (Count 17) aggravated assault of Brandon Cox; (Count 18) armed robbery of Nicholas Garner; (Count 19) armed robbery of Dimitri Hunter; (Count 20) armed robbery of Aaron Garner; (Count 21) armed robbery of Brandon Cox; and (Count 22) armed robbery of Shanice Green.  Arnold was charged separately as follows: (Count 5) felony murder (possession of a firearm by a convicted felon) of Nicholas Garner; and (Count 6) felony murder (possession of a firearm by a convicted felon) of Lateisha Weatherspoon.  Marchman was charged separately as follows:  (Count 7) felony murder

reasons set forth below.

Viewed in the light most favorable to the verdict, the evidence presented at trial showed that in the weeks prior to the evening when these crimes occurred, Marchman, Arnold, and Isaiah Walker, who was also a party to the crimes (but who took his own life to avoid apprehension), were engaged in a dispute with Dimitri Hunter and some of his friends, including victims Nicholas Garner and Brandon Cox. Hunter, Garner, and certain others performed in a rap group together and would flash wads of cash during their performances at local clubs and on videos that were available for review on YouTube.

On July 9, 2010, Marchman, Arnold and Walker told a woman who testified at trial that they were looking to purchase marijuana and also wanted

(possession of a firearm by a convicted felon) of Nicholas Garner; (Count 8) felony murder (possession of a firearm by a convicted felon) of Lateisha Weatherspoon. Appellants were jointly tried April 16-27, 2012, and the jury returned a verdict of guilty on all charges. With respect to the verdicts on the charges involving the two murder victims, the felony murder verdicts (Counts 3 through 8) were vacated as a matter of law, and pursuant to the sentencing order the trial court merged the aggravated assault counts as to each of the two murder victims (Counts 12 & 13) into the respective malice murder conviction, and the trial court entered a life sentence without the possibility of parole against each appellant. With respect to the kidnapping with bodily injury verdicts (Counts 9 and 10) and the armed robbery verdicts (Counts 18-21), the trial court entered a life sentence without the possibility of parole pursuant to OCGA § 17-10-7 (a) and (c) against each appellant. With respect to the kidnapping verdict (Count 11) and aggravated assault verdicts for victims other than the murder victims, (Counts 14-17) the trial court entered a sentence of twenty years to serve pursuant to OCGA § 17-10-7 (a) and (c) against each appellant. Each appellant filed a motion for new trial, and after a joint hearing on the motions each was denied. Each appellant filed a timely notice of appeal, and the cases were docketed in this Court to the January 2016 term of court for decisions to be made upon the briefs.

to "hit a lick," meaning to rob someone. As a result of calls that were made, Hunter, who was to deliver the marijuana, arrived by automobile with his friends Lateisha Weatherspoon and Shanice Green at the place where the three conspirators were waiting to make the purchase. Armed with handguns, Marchman and Walker entered the car Green was driving, a white Impala. Walker put a gun to Hunter's head, demanded the occupants' cell phones, and ordered Green to drive. Upon having Green pull the car over, Marchman and Walker discovered Hunter was armed with an extended-magazine Glock pistol. They disarmed Hunter, began pistol-whipping him, and forced him into the Impala's trunk. They then met up with Arnold, who commenced following Green's Impala in a blue Marquis. At some point, the two cars stopped at a convenience store/service station where the perpetrators retrieved Hunter out of the Impala's trunk and forced him into the Marquis' trunk. Their actions were captured on the business' surveillance videotapes. The perpetrators, still holding Green, Weatherspoon, and Hunter against their will, continued to drive around Cobb County in the two cars.

Eventually, the three perpetrators, now covering their faces, delivered Hunter to the home where Aaron Garner lived with his brother Nicholas Garner,

and used Hunter as a decoy to trick Aaron into letting them in the door. Upon entering, Marchman and Walker commenced beating Aaron and continued beating Hunter. Shortly thereafter, Nicholas Garner arrived home in a car driven by Brandon Cox, and Nicholas went inside to retrieve gas money he had agreed to pay Cox. Upon entering his home, Nicholas was held at gun point. When Marchman and Walker realized someone was waiting outside in a car, they forced Nicholas to persuade Cox to come inside. Marchman and Walker then held all four men at gunpoint, tortured them with a hot spoon, and ransacked the home looking for money and marijuana. Meanwhile, Arnold was holding Weatherspoon and Green captive in the Marquis while he continued to drive around, during which time he communicated with Marchman and Walker via the stolen cell phones. Green was pregnant, and in an effort to escape she faked labor pains and urinated on herself to make it appear her water had broken. Ultimately, Arnold released her at a hospital but threatened to kill Weatherspoon and Hunter if she informed anyone about the crimes that were transpiring. At the urging of friends, however, she reported her car as being stolen. Once her torched car was discovered, Green told investigators in detail what had transpired.

When Marchman and Walker, still at the Garner residence, learned by telephone that one of the hostages had been released, they were heard saying they now had to kill all the witnesses. Hunter, Cox, and Nicholas Garner were shot at the Garner residence, though only Nicholas was fatally wounded. Marchman and Walker left the scene, after which Aaron Garner and Cox escaped and were able to seek assistance. A crime scene investigation was commenced at the Garner residence, where Nicholas Garner's body was found.

In the continuing crime spree, at around 3:00 a.m., the three perpetrators arrived in two separate vehicles at the home of their friend Marcus Woodward, who saw a female sitting in an Impala parked in the driveway. Arnold and Walker drove both cars away from Woodward's home while Marchman stayed inside. They drove to a remote location, shot Weatherspoon in the head, and doused the Impala in which she was killed with gasoline and lighted it on fire. Several destroyed cell phones were found in the car when it was discovered along with Weatherspoon's body. Woodward testified that when Walker and Arnold returned to his home in the Marquis, he noted a distinctive odor of gasoline. After the burned-out Impala was discovered, and based upon information gathered from witnesses, law enforcement began searching for a

5

blue Marquis, and they located a car matching that description driving down the road near the burned-out Impala's location. Walker was in the front passenger seat of the car and, either at gunpoint or by intimidation, he was forcing Woodward to drive. When a patrolman attempted to make a traffic stop, Walker fired at him, striking the patrol vehicle several times. A car chase ensued, and when the Marquis approached a road block, Walker took his own life with a gun that proved to be the one taken from Hunter. Shell casings from the gun matched casings found at the site of the Garner home invasion.

DNA testing confirmed Hunter had been in the trunk of the Marquis. The medical examiner's testimony established that the cause of Nicholas Garner's death was multiple gunshot wounds, and that the cause of Lateisha Weatherspoon's death was a gunshot wound to the head. Using cell phone records and other evidence, law enforcement was able to confirm that Marchman and Arnold were involved in the criminal enterprise. Before he was arrested, Marchman fled to Alabama, where he made incriminating statements about these crimes to a witness who testified at trial. Arnold's fingerprints were found in multiple places on the Marquis, including the front passenger door, the trunk and the fuel door. Marchman and Arnold were identified at trial by the victims

as well as other witnesses who observed the drug transaction that started the events in question.

*Case No. S16A0027 (Marchman):*

1. We reject Marchman's assertion that the evidence against him was entirely circumstantial and did not support his convictions because the evidence failed to exclude every other reasonable hypothesis save that of guilt. Hunter and Green identified Marchman as one of their kidnappers. Witness Kayla Cochran identified Marchman and Arnold as two of three men in a blue Marquis who stopped to talk to her about finding marijuana and "hitting a lick," and who entered Hunter's car when he arrived with the marijuana for them to purchase. Cox identified Marchman as one of the men who attacked and robbed him at the Garner residence. Woodward identified Marchman as one of the three men who arrived at his house a short time after the Garner home invasion in two separate cars, an Impala and a Marquis, and Woodward testified the men were armed with guns and possessed cash, marijuana, and a ski mask. Woodward further testified that Marchman remained at his house while the other two men drove away in both cars, with a female passenger in the Impala. When the other two men returned in the Marquis and without the Impala or its female passenger,

7

they smelled of gasoline. Phone records showed that a cell phone associated with Marchman was used to call Hunter's phone during the crime spree after Hunter's phone was taken from him, and that Arnold was using Hunter's phone while he was holding the women hostage while Marchman and Walker were carrying out the crimes committed at the Garner residence. Additionally, Marchman made incriminating statements to a friend in Alabama where he fled after these crimes were committed.

Assessing witness credibility is the province of the fact finder; likewise, this Court does not re-weigh the evidence but defers to the jury's findings. *Berrian v. State*, 297 Ga. 740, 742 (1) (778 SE2d 165) (2015). Even with respect to the convictions on those counts of Marchman's indictment for which the evidence was circumstantial, this Court will not disturb the jury's findings unless they are insupportable as a matter of law. See *Daniels v. State*, 298 Ga. 120, 123 (1) (779 SE2d 640) (2015). Here, the evidence was sufficient to exclude every reasonable hypothesis save that of guilt, and to warrant Marchman's conviction, either as a perpetrator who directly committed the crime or as a party to the crime, on each of the crimes charged. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LEd2d 560) (1979).

8

2. Marchman asserts he is entitled to a new trial because the trial court erred in admitting cell phone records in the case. At the motion to suppress hearing, the investigating officer testified that the authorities obtained the cell phone numbers of the victims whose phones were stolen on the night in question, along with the phone number witness Cochran told authorities and testified that Marchman provided to her as his contact number on the night he came asking about a source for purchasing marijuana. Cochran also testified at trial to this effect. The officer further testified that the identity of the service provider for the number associated with Marchman was obtained from a database of such information that is available to law enforcement. Investigators then made what is known as an "exigency request," followed by a grand jury subpoena, for call detail information for that number during the relevant period of time.[2] Later, a court order was obtained for cell tower information regarding calls sent and received by that cell number. As a result, authorities were able to identify a phone number that was linked to co-defendant Arnold, and to obtain

---

[2] Here, the evidence shows the initial emergency request to the service provider for call detail information was promptly followed by a grand jury subpoena. Thus, the concerns raised by the special concurrence in *Registe v. State*, 292 Ga. 154, 159 (2) (734 SE2d 19) (2012) (Hunstein, C. J., and Blackwell, J., concurring specially and citing the potential for abuse of requests to cell phone service providers made without a warrant or court order) are not present in this case.

9

service provider records for that number. The trial court denied Marchman's motion to suppress. From this information, the State presented trial evidence showing that cell phones with phone numbers associated with Marchman and Arnold made calls on the night in question to cell phones that were stolen from the victims, and that those calls were routed through certain cell towers near the locations where the crimes occurred.

Citing *Riley v. California*,[3] Marchman challenges the cell phone evidence presented at trial on the ground that the State failed to obtain a search warrant for this evidence and therefore violated his constitutional right to be protected from unreasonable searches and seizures. This challenge fails, however, since no evidence was presented that the State ever searched, or even possessed, the phone that was assigned the number associated with Marchman. Accordingly, *Riley* and its companion case, *United States v. Wurie*[4] are inapplicable, as those cases involved the seizure of cell phones incident to arrests and the search of digital information contained in those phones. By contrast, in this case no

---

[3] ___ U.S. ___ (134 SCt 2473, 189 LE2d 430) (2014) (holding that the search incident to arrest exception to the Fourth Amendment's warrant requirement does not apply to the search of digital information contained within a cell phone that is seized incident to arrest).

[4] Id.

search was conducted upon a phone in Marchman's possession. Instead, the information to which Marchman objects was duly obtained from a third party–the service provider for the phone assigned the number associated with Marchman according to Cochran's testimony. Subscriber and call toll records belong to the service provider and, even if Marchman had shown he was the owner of the phone account in question, he had no reasonable expectation of privacy in these records.[5] See *Moss v. State*, 298 Ga. 613, 615-616 (3) (783 SE2d 652) (2016). A proper foundation was laid for the introduction of this information pursuant to the business records exception to the hearsay rule that was in effect at the time of trial. See former OCGA § 24-3-14.[6] A trial court's determination that evidence is admissible under this exception will not be reversed absent an abuse of discretion, and we find none here. See *Kilgore v. State*, 295 Ga. 729, 730 (2) (763 SE2d 685) (2014).

3. During its deliberations, the jury delivered to the trial court a written request for clarification on the law of parties to a crime. In response, the court

---

[5] In fact, Marchman presented no evidence that he had standing to challenge the evidence associated with the phone number he provided to Cochran because, at the motion hearing, he disclaimed ownership of that phone.

[6] The business records exception to the hearsay rule was carried forward, with some changes, into the new Evidence Code and can be found at OCGA § 24-8-803 (6).

re-read its original charge on parties to a crime, stating in pertinent part:

> Any party to a crime who did not directly commit the crime may be prosecuted for commission of the crime upon proof that the crime was committed and that the person was a party to it . . . even though the person alleged to have directly committed the crime has not been prosecuted or convicted, has been convicted of a different crime or degree of crime or is not amenable to justice or has been acquitted.

Marchman's counsel objected on the ground that the court read not only the charge relating to parties to a crime but also the charge relating to failure to prosecute principals, which Marchman asserted the jury did not request, and that objection was overruled. On appeal, Marchman again argues the trial court erroneously and gratuitously added a charge that was not requested.

Since the recharge was a correct statement of the law, was exactly the same as that given in its original instructions, and was not confusing or inappropriate, Marchman has failed to demonstrate error. See *Mister v. State*, 286 Ga. 303, 308 (6) (687 SE2d 471) (2009). Further, in response to the trial court's inquiry, the jury foreman stated that the recharge answered the jury's question. Consequently, we reject Marchman's assertion that the recharge was confusing and inappropriate.

4. Marchman asserts that the in-court identification of him by witness

12

Shanice Green was constitutionally unreliable because it was based upon a tainted out-of-court identification she made the day after she was kidnapped from what he claims was an impermissibly suggestive photographic lineup. Marchman filed a motion to suppress evidence and testimony concerning Green's identification of him from this photographic lineup. After conducting a thorough evidentiary hearing on this and other pending pre-trial motions, the trial court denied it. We find no error in the trial court's denial of Marchman's pre-trial motion to suppress or its denial of his motion for new trial with respect to admission of Green's identification of him at trial.

In a statement given to police on the day after the crimes were committed, Green described both the individuals involved in her kidnapping as black males who were wearing black shirts. Marchman argues that the most glaringly suggestive aspect of the photographic lineup shown to Green is that Marchman is the only individual in the six-photo array wearing a black shirt, while all five other men were wearing white. Marchman also points out that he was the only individual in the array who was looking down in his photo, while the other men were looking straight ahead, presumably thereby drawing attention to Marchman, and that one of the other photos should have been excluded from the

array because the individual appeared to have a beaten or swollen face, whereas the witness never mentioned in her interview with authorities that either of the perpetrators had any facial swelling. We reject Marchman's assertion that the photographic identification procedure was impermissibly suggestive because he failed to show the procedure used was so suggestive as to be the equivalent of telling the witness, "This is our suspect." See *Marshall v. State*, 285 Ga. 351, 352 (2) (676 SE2d 201) (2009).[7]

"Moreover, even if a pretrial identification is tainted, an in-court identification is not constitutionally inadmissible if it does not depend upon the prior identification but has an independent origin." (Citations and punctuation omitted.) *Wilson v. State*, 275 Ga. 53, 59 (3) (562 SE2d 164) (2002). Here, an independent origin for Green's in-court identification was shown. Green identified Marchman at trial and testified in detail about his involvement in the events of the night in question. Green testified that she was driving her Impala when she, Hunter, and Weatherspoon drove to the place where Hunter attempted

---

[7] Although Marchman asserts that the recording of the interview in which Green identified Marchman as the only person in the lineup who looked familiar demonstrates that the police officer who interviewed her prompted her to chose Marchman's photo, the evidence does not support that assertion since the recording was not included in the record on appeal.

14

to make a drug sale. One of the perpetrators got into the back seat of the car and forced her at gunpoint to drive as he directed her. After driving a short distance Green was directed to drive back to the house where the gun-wielding perpetrator had entered her car, at which point Marchman exited the house, entered the car, and sat in the front passenger seat. She testified she saw Marchman and the other perpetrators pull Hunter out of her car and force him into the trunk of the Marquis that came driving up behind them. She also testified that, at some point, she was placed in the back seat of her car and Marchman commenced driving. Marchman stopped the car at a library, and she saw him walk across the street to a gas station and walk up to the trunk of the Marquis, driven by Arnold, where it had stopped. Green's trial testimony supported the conclusion that she spent a significant period of time in Marchman's presence. When asked why she picked Marchman out of the photographic lineup she testified: "Because I saw his face." Considering the totality of the circumstances, we find the witness' identification to be reliable. See *McBride v. State*, 291 Ga. 593, 594-595 (2) (732 SE2d 757) (2012).

5. While Marchman and Arnold were holding Hunter hostage in the trunk of the Marquis, they stopped and went inside a service station convenience

store.  Still photos printed from surveillance videotape recordings from inside and outside the store were admitted into evidence.  Both the owner of the store and the clerk on duty at the time the perpetrators stopped at the store testified and authenticated the admitted photos.  In response to the prosecutor's questioning, the owner testified he reviewed the video recordings from which the photos were printed and recognized his employee standing behind the counter.  Marchman asserts the trial court erred in overruling his objection to this portion of the owner's testimony, and that he is entitled to a new trial.

Relying upon *Grimes v. State*,[8] Marchman argues it is improper to allow a lay witness who was not present during the events depicted in a video to identify someone on the video because such testimony tends only to establish a fact that the jurors could decide for themselves.  In *Grimes*, however, whether the defendant was the person depicted on the videotape was critical to the defendant's defense, whereas in this case the identity of the store clerk is merely cumulative of the clerk's own testimony that he recognized himself in the still photos of the scene when he authenticated them, as well as the owner's testimony confirming that his business records showed the clerk was on duty on

---

[8]  291 Ga. App. 585, 590 (2) (662 SE2d 346) (2008).

the night in question. The clerk's identity is not central to the case; what is relevant is whether the jury can recognize Marchman and Arnold in the photos and thus place them at this location at the time recorded by the video equipment. Accordingly, any error in the admission of this testimony was harmless. See *Brooks v. State*, 281 Ga. 514, 518 (4) (640 SE2d 280) (2007).

6. Marchman asserts he is entitled to a new trial because the in-court identification of him by witness Kayla Cochran was tainted by the fact that she identified Marchman the day after these crimes were committed from an impermissibly suggestive single photograph of him.[9] Cochran testified that Marchman and the other two perpetrators spent some time with her the afternoon before the crime spree commenced and asked her about obtaining marijuana. Ultimately, the perpetrators were put in touch with Hunter, who arrived in an Impala to make the sale. Cochran also testified that within a day or two after these events she met with an officer who showed her a photograph and asked her if the person in the photograph looked familiar. Her trial testimony demonstrated, however, that her in-court identification was based

---

[9] When Cochran was asked if she recognized the person in the photo shown to her she responded that the person was "Z," the name Marchman gave her on the day she met him.

17

upon the time she spent interacting with Marchman and the other perpetrators, during which time she had a good opportunity to view them.

Even if, as Marchman argues, Cochran's pre-trial identification of him from the photographic lineup was impermisibly suggestive, here, the witness had an independent basis for her identification of Marchman. See *Wilson v. State*, supra. Since the witness' in-court identification did not depend upon the prior photographic identification which appellant asserts to have been improper, but instead had an independent origin, we find no error in the trial court's denial of Marchman's motion for new trial.

*Case No. S16A0028 (Arnold):*

7. Arnold does not raise the issue of the sufficiency of the evidence to sustain his conviction. Nevertheless, as is this Court's practice, we have reviewed the evidence and considered its legal sufficiency. Referring to the reasoning set forth in Division 1 in which we reviewed the sufficiency of the evidence against Marchman, we likewise conclude that the evidence adduced at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Arnold was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781,

18

61 LE2d 560) (1979). In addition to the evidence discussed in Division 1, Hunter and Green, in their trial testimony, also identified Arnold as one of the men involved in their kidnapping and both identified Arnold as the man who drove the Marquis. Woodward identified Arnold as one of the three armed men who arrived at his house a short time after the Garner home invasion in two cars, an Impala and a Marquis, and he was one of the men who drove away while Marchman remained at Woodward's house, later returning in only the Marquis, without the female passenger, and smelling of gasoline. The evidence was sufficient to exclude every reasonable hypothesis save that of guilt, and to warrant Arnold's conviction, either as a perpetrator who directly committed the crime or as a party to the crime, on each of the crimes charged.

8. For the reasons set forth in Division 5 of this opinion, we reject Arnold's assertion that reversible error is shown by the admission of the testimony of the convenience store owner regarding the identity of the store clerk shown on surveillance videotapes or still photos from those tapes.

9. Arnold asserts his Sixth Amendment right to confront a non-testifying witness against him was violated when the trial court admitted, over his objection, the hearsay testimony of two different witnesses relating to statements

made to them by an alleged co-perpetrator who was unavailable for cross-examination. Arnold also argues this testimony was not admissible under any exception to the Hearsay Rule. We reject these assertions.

In the first instance, after conducting a hearing outside the presence of the jury, the trial court admitted under the necessity exception to hearsay the testimony of a witness who testified that Isaiah Walker told her about an interruption in his cell phone service. She further testified that she was Walker's former girlfriend, that they had dated for years, and that, although they were not dating at the time the crimes occurred, they remained in close contact and still confided in each other about personal matters. According to this witness, Walker told her just before his death that his cell phone service had been turned off on July 9 for non-payment. This testimony was relevant to explain why Walker's cell phone was not sending or receiving calls on the evening these events occurred.

Walker's statement to the witness regarding his cell phone service was not testimonial in nature, and thus, contrary to Arnold's assertion, the witness' testimony about these statements was not barred by the Confrontation Clause. See *Franklin v. State*, ___ Ga. ___ (2) (784 SE2d 359) (2016). Accordingly, the

testimony was admissible if it qualified as an exception to the rule against hearsay.  Under the old Evidence Code,

> [f]or a statement to be admissible under the necessity exception to the rule against hearsay, its proponent must show a necessity for the evidence, a circumstantial guaranty of the statement's trustworthiness, and that the hearsay statements are more probative and revealing than any other available evidence.

(Citation and punctuation omitted.)  *Davis v. State*, 294 Ga. 486, 487 (2) (754 SE2d 67) (2014). The first prong of the exception was satisfied because Walker committed suicide and was not available to testify.  The witness' testimony about her relationship with Walker was sufficient to demonstrate the trustworthiness of Walker's statement to her.  No evidence was presented, however, with respect to the third prong of the admissibility test–whether the hearsay statement was more probative and revealing than any other available evidence.  Presumably, evidence concerning Walker's phone service was available from his service provider.  Nevertheless, other admissible evidence was presented at trial sufficiently linking Arnold's conduct with that of co-defendant Marchman and his co-perpetrator Walker. Consequently, even if this testimony about the interruption of service to co-perpetrator Walker's cell phone was erroneously admitted we find it was harmless error in light of the

21

overwhelming evidence of Arnold's guilt. See *London v. State*, 274 Ga. 91 (4) (c) (549 SE2d 394) (2001). Furthermore, as Walker's statements to the witness were neither custodial statements nor testimonial in nature, contrary to Arnold's assertion, no *Bruton* violation is shown. See *Bruton v. United States,* 391 U.S. 123 (888 SCt 1620, 20 LE2d 476) (1998); *Billings v. State*, 293 Ga. 99, 103-104 (4) (745 SE2d 583) (2013).

In the second instance, the trial court admitted the testimony of the friend to whose home in Alabama Marchman fled after commission of these crimes. The witness testified regarding certain statements Marchman made to him about what had transpired in Cobb County. The trial court admitted this testimony, over Arnold's objection, under the co-conspirator exception to hearsay. Pursuant to the rules of evidence applicable at the time of this trial, once the fact of a conspiracy is proved, the declarations of a conspirator during the pendency of the conspiracy are admissible against all the conspirators. See former OCGA § 24-3-5 (now codified at OCGA § 24-8-801 (d) (2) (E)); *Hassel v. State*, 294 Ga. 834, 839-840 (3) (755 SE2d 134) (2014). This exception to the hearsay rule applies to statements made not only during the events leading up to and during the crime "but also afterward, during the concealment phase of the conspiracy."

*Hassel*, supra, 294 Ga. at 389 (3). Here, ample evidence was presented of the existence of a conspiracy between Marchman, Arnold, and Walker to commit the crimes of which Marchman and Arnold were convicted. At the time Marchman made these statements, he had fled to Alabama in an obvious attempt to avoid apprehension and conceal the crime, and neither Arnold nor any other conspirator had been arrested or given a statement regarding the case. Moreover, the admission of Marchman's statements to a lay witness during the concealment phase of the conspiracy did not violate the Sixth Amendment Confrontation Clause because they were not testimonial in nature. See *Allen v. State*, 288 Ga. 263, 267 (4) (702 SE2d 869) (2010). Accordingly, we find no error in the admission of this testimony.

10. The trial court admitted into evidence the testimony of witness Anthony Hall that, while Hall was incarcerated for an unrelated offense, he and Arnold were both on the same bus as they were being transported from the jail to the court for hearings. At trial, Hall testified that on the day he appeared for a hearing he identified Arnold as being one of the men, along with Marchman and Walker, who, on the day of these crimes, picked him up and gave him a ride in a blue car. Hall further testified at trial that, while on the transport bus,

23

Arnold verbally threatened him for "snitching." Hall testified that Arnold told him he "was going out bad," and that Arnold was going to "kick his ass" and "f*** him up." Arnold asserts the trial court erred in allowing this testimony to be presented since it amounts to nothing more than inadmissible character evidence. We reject Arnold's assertion that no reason exists for the admission of Hall's testimony other than to prejudice the jury against him. "[E]vidence of a threat to a witness by the defendant is relevant as showing an attempt to prevent a witness from testifying and [thereby] avoiding punishment for the crime." *McCoy v. State*, 273 Ga. 568, 571 (5) (544 SE2d 709) (2001). Admission of such evidence of a threat is in the discretion of the trial court, id., and we reject Arnold's assertion that the relevance of this testimony was substantially outweighed by the danger of unfair prejudice by its admission.

Judgments affirmed. All the Justices concur.