301 Ga. 759
FINAL COPY

S17A1143. LEWIS v. THE STATE.

BENHAM, Justice.

Devasko Lewis was found guilty of malice murder and other crimes arising out of the shooting death of Kerry Glenn.[1]

1.     Evidence presented at trial showed that Glenn was shot by Jamarcus Clark, the hit man in a botched murder-for-hire scheme and Lewis's co-indictee.  Lewis hired Clark to murder his trucking business partner, Corey Daniels, over a dispute involving money and the business.  Pursuant to the scheme, Clark was also hired to retrieve from the house of Daniels's mother, Ernestine McGhee, titles to semi-trucks and money that

---

[1] The crimes occurred on January 9 and January 14, 2014.  On March 25, 2014, a Houston County grand jury returned an indictment charging both appellant and his co-indictee Jamarcus Akeem Clark with malice murder; felony murder (aggravated battery); aggravated battery; two counts of possession of a firearm during the commission of a felony; and two counts of conspiracy to commit murder (Corey Daniels and Ernestine McGhee).  Appellant faced a jury trial conducted April 13-17, 2015.  Appellant was acquitted of the charge of conspiracy to commit murder relating to victim Ernestine McGhee, and the two charges of possession of a gun during the commission of a felony were nolle prossed.  Appellant was convicted of all other charges. The felony murder guilty verdict was vacated as a matter of law, and the aggravated battery verdict merged into the murder verdict.  The trial court sentenced appellant to life imprisonment without parole for the malice murder conviction and to imprisonment for ten years for the conspiracy to commit murder conviction, to run consecutively to the sentence for murder.  Appellant filed a timely motion for new trial along with an amended motion for new trial, but the trial court denied these motions after conducting a hearing.  Appellant filed a timely notice of appeal, and this case was docketed to the April 2017 term of court and was orally argued on June 20, 2017.

Lewis claimed Daniels owed him. As to motive, the evidence showed that when Lewis came under federal indictment for problems with his company, he transferred the business into Daniels's name but remained a silent partner. Both Lewis and Daniels were indicted with respect to alleged crimes involving the business, and Daniels agreed to testify against Lewis. Daniels testified at the trial involved in this appeal that Lewis had sent threatening text messages to Daniels before Glenn was killed.

Clark testified at Lewis's trial that he met Lewis through his cousin, Tony Taylor. Taylor told Clark that a person named Devasko wanted a job done and would give Clark the details when he hired him. Lewis then met with Clark and Taylor, told them a man named Corey owed him a large sum of money, and that he wanted Clark to get the money and truck titles, which were at Daniels's mother's house. Lewis told Clark that if Daniels's mother would not let him in the house, to "take her out." Lewis planned an attack whereby Clark would get into Daniels's house, demand the truck titles, and then kill Daniels. Lewis showed Clark the house and suggested Clark could, as a ruse, approach Daniels by asking about a race car parked at the side of the house. Lewis paid Clark $1,000, and they agreed he would pay Clark an additional $4,000.

On January 9, 2014, Clark approached Mrs. McGhee's house on foot. When she would not let him in the house, Clark left and called Taylor who told Clark to "nail it up," meaning to fire some shots through the door. Clark went back to the house and fired three or four shots, but did not attempt to shoot Mrs. McGhee or enter the house. On January 14, Lewis supplied Clark with a truck to travel from Tifton to Houston County to carry out the murder, and the two men were seen on a surveillance video at a gas station where Lewis purchased gas for the truck he loaned to Clark. Clark drove to Daniels's house and posed as a person interested in purchasing a race car parked in the yard, as Lewis suggested. He shot a man he believed was Daniels, but in fact was Daniels's nephew, Kerry Glenn, who lived at Daniels's house. Afterward, Lewis began contacting Clark directly, using a pre-paid disposable cell phone he had purchased for the purpose of communicating with Clark. The next day, Lewis came to pick up the truck he loaned to Clark and told Clark he had killed the wrong man. He then paid Clark an additional $2,500. Taylor testified at Lewis's trial that he saw Lewis giving Clark money. Clark was arrested based upon information discovered during the investigation of the crimes, and Clark confessed during his

interrogation. Clark identified Lewis in a photo lineup as the man who planned both incidents.

Lewis challenges the sufficiency of the evidence to support his convictions. Lewis testified in his own defense and denied hiring Clark to commit the charged offenses. He asserts that Clark's and Taylor's testimony was impeached, and that the two men's testimony was contradictory in many material details. Lewis also asserts that the circumstantial evidence presented to corroborate Clark's and Taylor's testimony was explained away as being harmless to the defense. Relying on OCGA § 24-14-8,[2] Lewis argues that the testimony of his accomplice is insufficient to support his felony conviction because it was uncorroborated.

With respect to the corroboration of accomplice testimony, however, the corroborating evidence may be circumstantial and slight, and need not be sufficient in and of itself to warrant a conviction, so long as it is independent of the accomplice's testimony and directly connects the defendant to the crime or leads to the inference of guilt. *Bradshaw v. State*, 296 Ga. 650, 654-

---

[2] OCGA § 24-14-8 states in pertinent part: "The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including . . . felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness . . . ."

4

655 (2) (769 SE2d 892) (2015). "Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is sufficient corroboration of the accomplice to support a verdict." Id. at 655 (2). Having reviewed the trial evidence, we conclude the evidence corroborating the accomplice's testimony was sufficient to support the verdicts in this case. With respect to the assertion that the testimony of Clark and Taylor was contradictory, this Court does not reweigh evidence or resolve conflicts in testimony, as these are the functions of the jury. See *Rai v. State*, 297 Ga. 472, 476 (1) (775 SE2d 129) (2015). Appellant also asserts that Taylor's testimony was not to be believed because of an alleged motive to fabricate a story that implicated Lewis in order to gain favor in a felony proceeding that was pending against him. The record reflects, however, that information about Taylor's legal troubles was placed before the jury and Taylor was cross-examined about it. It is the jury's role to assess the credibility of witnesses. See *Marchman v. State*, 299 Ga. 534, 537 (1) (787 SE2d 734) (2016). Accordingly, we conclude the evidence was sufficient to authorize the jury verdicts under the standard set forth in *Jackson v. Virginia*.[3]

---

[3] 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. At the motion for new trial hearing, appellant introduced an envelope and letter addressed to defense counsel that was postmarked approximately two months after the trial concluded. The return address indicates the mailing was from Jamarcus Clark at Smith State Prison, and bore Clark's correct inmate number. The body of the handwritten letter was printed, and it was signed with what appears to be the name Jamarcus Clark in cursive writing. It purports to be written in the first person by Clark. The letter states he wants to "clear up some things." It claims that Clark and Taylor contrived a plan to rob a man whom Taylor believed to have money that was owed to someone Taylor knew, and that the only time he met Lewis was when he and Taylor went by Lewis's shop to borrow his work truck, after which Lewis accompanied them to a gas station and filled up the truck. The letter expresses remorse about telling lies about Lewis, and states that he testified as he did at trial because he was told the district attorney would "go easy" on him if he told them about Lewis. Based on that belief, he made up the story about Lewis's involvement in the crimes.

Clark appeared as a sworn witness at the hearing. He confirmed he had previously been incarcerated at Smith State Prison and that the prisoner number on the envelope was his. He refused to answer any questions about

6

the letter, however, despite being ordered to do so by the trial court. He neither admitted nor denied writing the letter or that the printing in the body of the letter or the signature on the letter was his. He also refused to state that his trial testimony was false. Clark admitted he signed two plea forms regarding the charges against him arising out of these crimes, and he identified his signature on those forms. He refused to answer questions, however, about the comparison of his plea form signatures and the signature on the letter. Appellant's counsel asked the trial court to take notice of the similarity of the signatures on the plea forms and the letter.

In its order denying the motion for new trial, the trial court found that even assuming the letter was voluntarily written and signed by Clark, the letter is only impeaching in nature and does not provide sufficient proof to establish Clark's trial testimony was purely fabricated. Accordingly, the trial court denied the motion for new trial with respect to the argument that Clark's testimony had been recanted.

Generally, a recantation of a witness' trial testimony is merely impeaching of the trial testimony and does not establish a convicted defendant's right to a new trial, even if the witness states under oath that his prior trial testimony was false. See *Davis v. State*, 283 Ga. 438, 441 (3) (A)

7

(660 SE2d 354) (2008); *Norwood v. State*, 273 Ga. 352, 353 (2) (541 SE2d 373) (2001). The witness' original testimony would be admissible against the defendant at any retrial, and that original testimony would have greater credibility than a later recantation. See *Davis*, supra. An exception to that rule is created when a trial witness is convicted of perjury with respect to his trial testimony and the trial court concludes that the guilty verdict could not have been obtained without the perjured testimony. See OCGA § 17-1-4. The only other exception to the rule against setting aside a verdict based on a challenge to trial testimony "is where there can be no doubt of any kind that the State's witness' testimony in every material part is purest fabrication." (Citation and punctuation omitted.) *Norwood*, supra. That exception is met when the witness' testimony is shown to be an impossibility. See *Fugitt v. State*, 251 Ga. 451, 452 (1) (307 SE2d 471) (1983) (motion for new trial granted where a material witness could not possibly have observed the events to which he testified at trial because it was later shown that the witness was incarcerated at the time of those events, and that a party the witness implicated in his testimony was later shown to have been employed out of state at that time). Where, as in *Fugitt*, the post-trial evidence demonstrates that material trial testimony is purest fabrication, "[i]t cannot be said . . . that

the new evidence establishing [the witness'] perjury is 'merely impeaching.'" Id. at 453 (1).

Appellant asserts that the contents of the letter presented at the motion for new trial hearing demonstrates Clark's trial testimony was the "purest fabrication" and not merely impeaching, and thus the trial court should not have summarily denied his motion for new trial without a determination of such factors as whether, absent the recanted testimony, the evidence was sufficient to support the verdict. But appellant's reliance on *Fugitt* for the assertion that the letter is not merely impeaching is misplaced. Here, even if Clark had verified the contents of the letter under oath (which he did not), the evidence would consist only of the witness' recantation that would merely serve to impeach his previous sworn testimony, and not independent evidence that illustrates the impossibility of the facts to which the witness previously testified. See *Davis*, supra, 283 Ga. at 441 (3) (A); *Norwood*, supra, 273 Ga. at 353 (2). Moreover, significant additional trial evidence affirms the trial testimony of the witness and supports the verdict. Among other things, a motive was shown, Taylor's testimony is consistent with that of Clark's in a number of material details, and cell phone records support Clark's trial

9

testimony. Accordingly, the trial court did not err in denying the motion for new trial on this ground.[4]

3.     Appellant urges that if this Court concludes, as we have, that appellant is not entitled to a new trial because this case involves neither testimony that has been proven false by the witness' conviction for perjury nor testimony regarding facts that have been shown to have been an impossibility, then this Court should find that the current Georgia standard for granting a new trial based on recanted testimony is unconstitutional. According to appellant, this standard violates the due process and equal protection clauses of the United States and Georgia Constitutions. With respect to due process, appellant asserts that, at a minimum, the trial court should have discretion to grant a new trial when a key witness admits post-trial that he testified falsely and that the defendant did not commit the acts for which he was convicted. According to appellant, the trial court is in the best position to evaluate a recantation claim, but Georgia's standard for granting a new trial precludes the trial court from making that determination absent a perjury conviction or proof of the impossibility of the witness' testimony.

---

[4] Pointing to case law in other jurisdictions, appellant urges this Court to expand the grounds for granting a new trial based on recanted testimony beyond the exceptions for perjury and impossibility, but we decline to do so.

According to appellant, permitting the trial court to exercise its discretion to grant a new trial based on recanted testimony is required to guarantee the fundamental fairness of the criminal proceedings against him. With respect to equal protection of the law, appellant claims that even if no fundamental right is involved, disparate treatment of similarly situated individuals must be rationally related to a legitimate state interest. He argues that individuals who have been convicted by testimony that was later recanted by the witness are treated differently depending upon whether the prosecutor chooses, or not, to prosecute the witness for perjury, and that no rational basis exists for such differential treatment. Appellant laments that because a convicted criminal is powerless to prosecute a trial witness and obtain a conviction for perjury, he must depend on the very prosecutor who obtained his conviction to preserve his right to a new trial in these circumstances.

As noted earlier, OCGA § 17-1-4 requires a trial court to vacate a verdict (upon motion and notice to the adverse party) that appears to have been entered as a result of wilful perjury, but only if the witness has been convicted of perjury arising out of his trial testimony and the trial court concludes the verdict could not have been reached without the perjured testimony. This statutory requirement of a perjury conviction has been

11

challenged before. Years ago, this Court rejected the same constitutional challenges that are now asserted by this appellant. See *Burke v. State*, 205 Ga. 656, 659-660 (54 SE2d 350) (1949). In *Burke*, we held that OCGA § 17-1-4 (formerly codified at Code 1933 § 110-706) was actually in harmony with United States Supreme Court decisions holding that the due process guaranteed by the Fourteenth Amendment is denied when a conviction is procured by perjured testimony. Id. at 659. The statute requires a verdict obtained by perjured testimony to be set aside. This Court noted, however, that when the only evidence of perjury is that a trial witness later gives testimony contrary to that given at trial, the trial court "ought not to be called upon to say whether or not one of such statements is enough reliable evidence to authorize disbelief of the other." Id. at 660. Instead, the statutory requirement for a perjury conviction to be obtained before a guilty verdict may be vacated "relieves the court of the burden of choosing between contradictory statements and requires evidence which is convincing and which comes from the purest source, to wit, a conviction for perjury." Id. We further held that this Code section applies to all persons, and therefore does not deny equal protection of the law to anyone. Id. See also *Chatterton v. State*, 221 Ga. 424, 429 (1) (144 SE2d 726) (1965). Again, we reject the

assertion that the provisions of OCGA § 17-1-4 violate a convicted criminal's rights to due process and equal protection of the law.

4.　In a case in which a jury finds a defendant guilty of murder, except where the prosecutor seeks the death penalty, sentencing is determined by the judge. See OCGA § 17-9-2. Pursuant to OCGA § 16-5-1 (e) (1), "[a] person convicted of the offense of murder shall be punished by death, by imprisonment for life without parole, or by imprisonment for life." Appellant complains that this means a person convicted of murder can have his sentence enhanced above the statutory minimum of life with the possibility of parole without notice of the prosecutor's intent to seek the death penalty, without a jury's finding beyond a reasonable doubt that a statutory aggravating circumstance exists, or a finding of any other element authorizing the greater sentence. According to appellant, this sentencing statute violates the United States Supreme Court's holding, in *Alleyne v. United States*,[5] that facts which increase the mandatory minimum sentence for a crime are elements of the crime that must be submitted to the jury and found beyond a reasonable doubt.

_____

[5] ___ U. S. ___ (III) (A) (133 SCt 2151, 186 LE2d 314) (2013).

13

The current sentencing scheme set forth in OCGA § 16-5-1 came about as a result of legislative changes which took effect in 2009.

> Prior to April 29, 2009, a person who was convicted of murder could either be sentenced to death or life in prison with the possibility of parole. Life sentences without the possibility of parole were only imposed in those cases in which the State sought the death penalty. In 2009, the General Assembly passed Ga. L. 2009, p. 223, § 1 (or Senate Bill 13) which amended OCGA § 16-5-1 (d) to add the sentence of life in prison without the possibility of parole as one of the punishments for murder. The bill also repealed OCGA §§ 17-10-31.1 and 17-10-32.1, thereby removing requirements that a jury find an aggravating circumstance before imposing the sentence of life without parole (OCGA § 17-10-31.1) and removing the sentencing duties of a judge regarding a person who pled guilty to an offense for which the death penalty or life without parole could be imposed (OCGA § 17-10-32.1).

(Citations and punctuation omitted.) *Williams v. State*, 291 Ga. 19, 20 (1) (727 SE2d 95) (2012). In *Williams*, this Court rejected the assertion that because the statute provides no guidance for the imposition of the sentence a judge can impose for a non-death penalty conviction, and does not provide for mitigating evidence, the statute is unconstitutional because it may be applied arbitrarily and capriciously in violation of the requirement for due process. Id. Another constitutional challenge to Georgia's murder sentencing statute was addressed and rejected in *Babbage v. State*.[6] In

---

[6] 296 Ga. 364, 368 (2) (b) (768 SE2d 461) (2015).

*Babbage*, this Court rejected the argument that the statute is at odds with the United States Supreme Court precedent, set forth in *Apprendi v. New Jersey*,[7] that any fact (other than the existence of a prior conviction) that increases the criminal penalty beyond a statutory maximum must be submitted to the jury and proved beyond a reasonable doubt. As we pointed out, life without parole falls within, and not beyond, the statutorily authorized punishment for all but a narrowly defined subset of murder cases. *Babbage*, supra, 296 Ga. at 368 (2) (b). Appellant asserts that his challenge to the sentencing statute is not precluded by our decision in *Babbage* because, in it, this Court ignored the Supreme Court's holding in *Alleyne* that a defendant must be given notice of any increase in the *minimum* mandatory punishment that may be imposed upon conviction. He claims that his life without parole sentence is directly in conflict with the pronouncement in *Alleyne* because it exceeds the minimum punishment that may be imposed upon a defendant convicted of murder without first placing him on notice that he would be subject to such punishment, and without setting forth the elements, facts, or criteria for imposing an increased sentence for the crime.

---

[7] 530 U. S. 466 (IV) (120 SCt 2348, 147 LE2d 435) (2000).

15

This challenge lacks merit. In fact, the Supreme Court in *Alleyne* clarified that its ruling "does not mean that any fact that influences judicial discretion must be found by a jury." *Alleyne*, supra, ___ U. S. at ___ (III) (C). In this case, sentencing appellant to life without parole did not increase the mandatory minimum sentence for the jury's guilty verdict. The sentencing statute simply authorizes a range of sentences for the trial judge to consider upon conviction of murder if the death penalty is not sought and imposed by the jury. The judge may impose either life or life without parole. Appellant argues the statute is unconstitutionally vague and violates the due process rights of an accused because it does not require the defendant to be placed on notice that life without parole may be imposed without a factual determination by a jury. This is simply not the case. The language of the murder statute clearly states the range of sentences that may be imposed upon conviction. See OCGA § 16-5-1 (e) (1). It clearly establishes that no additional facts are required to be found by the jury for the imposition of life without parole. In summary, the murder sentencing statute does not violate the rule in *Apprendi* because it does not authorize the trial judge to impose a sentence that exceeds the statutory maximum, nor does it violate the rule in *Alleyne* because it does not authorize the judge to increase the mandatory

minimum sentence for any element of the crime not found by the jury by virtue of its guilty verdict.

Judgment affirmed. All the Justices concur.

Decided August 14, 2017.

Murder. Houston Superior Court. Before Judge Nunn.

Hogue & Hogue, Laura D. Hogue, Susan D. Raymond, for appellant.

George H. Hartwig III, District Attorney, Daniel P. Bibler, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General, for appellee.