**SECOND DIVISION**
**MILLER, P. J.,**
**HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be**
*physically received* **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS*
*COURT. ALL FILINGS MUST BE SUBMITTED WITHIN*
*THE TIMES SET BY OUR COURT RULES.*

**June 28, 2021**

# In the Court of Appeals of Georgia

A21A0452. ANDERSON v. THE STATE.

PIPKIN, Judge.

Appellant Garrett Kyle Anderson was convicted by a jury of two counts of first-degree vehicular homicide, serious injury by vehicle, and aggressive driving.[1] He appeals following the denial of his motion for new trial, contending that the trial court erred in several rulings concerning the admissibility of evidence under OCGA § 24-4-404 (b); by denying his right to confront and cross-examine one of the State's witnesses and refusing to strike the witness' testimony; and by deeming certain out of court statements inadmissible hearsay. As more fully set forth below, we now affirm.

---

[1] The trial court merged Count 4 – aggressive driving – with Count 1 – homicide by vehicle in the First Degree – for sentencing.

Construed to support the jury's verdict,[2] the evidence shows that on May 25, 2014 – the Sunday before Memorial Day – Anderson locked his keys in his car while parked at the Walmart store located on Chastain Meadows Parkway in Cobb County. After several calls, Anderson located a locksmith company who agreed to come to his location, and Tansu Kanlica arrived to unlock his car. Kanlica testified that after seeing Anderson's car and ascertaining what kind of tools he would need to unlock the car, he quoted Anderson a price of $175.00; Anderson conferred with his passenger, Taylor Douglas, and then gave Kanlica permission to proceed.

After Kanlica unlocked the car, he presented Anderson with the receipt but Anderson did not immediately pay him. After again conferring with Douglas for several minutes, Anderson told Kanlica he did not have enough cash on him and to follow him to an ATM. Kanlica said he asked Anderson why he did not use the ATM in the Walmart, and Anderson told Kanlica he did not want to use that ATM and to follow him to a SunTrust ATM.

Kanlica, who was unfamiliar with the area, followed Anderson out of the parking lot; Kanlica was driving a Nissan 350Z, which is a "lower profile" car, and Anderson was driving a Mitsubishi Lancer. Kanlica said that at first Anderson was driving

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

normally; however, shortly after they left the parking lot, Anderson began driving erratically, making numerous turns and U-turns and appearing to take evasive maneuvers such as signaling a right hand turn and then turning left. Kanlica said this continued for about ten or fifteen minutes during which they passed "all kind of ATM['s]"and banks. Kanlica called Anderson several times but Anderson did not answer. When they stopped at a red light, Kanlica pulled up beside Anderson and asked him how much longer to their destination; Anderson told him that it was about a mile and a half to reach their destination, but, as soon as the light turned green, Anderson sped away. Kanlica said that now Anderson was going faster, switching lanes and zig-zagging in and out of traffic.

Kanlica again attempted to call Anderson, but he did not answer. Believing that Anderson was trying to elude him, Kanlica decided to call 911 and give them Anderson's tag number so the police could handle it. While Kanlica was on the 911 call, Anderson turned onto Barrett Lakes Boulevard and Kanlica followed him. Kanlica said they were going "fast;" he estimated they may have being going 70 to 80 miles an hour but admitted he did not look at his speedometer. According to Kanlica, Anderson was "switching lanes continuously" at a high rate of speed and then abruptly switched into Kanlica's lane and "hit the brakes," at which point Kanlica swerved to the left to

3

avoid hitting Anderson. The State presented evidence that Kanlica then hit the left curb, overcorrected to the right, lost control, and spun clockwise to the right onto the curb, then over the sidewalk and up an embankment into the trees before rolling back down.

Tragically, three teenage girls – 15-year-old Reina As-Salaam, 16-year-old Juliana Ferrell, and 16-year-old Monica Epps – were walking side by side down the sidewalk at the moment Kanlica lost control, and Kanlica's vehicle struck all three girls. Ms. As-Salaam, who was walking closest to the street, suffered massive injuries and was pronounced dead at the scene. Ms. Ferrell, who was walking in the middle, also suffered massive injuries but was still alive when she was transported to the hospital and was placed on life support. However, several days after the accident, Ms. Ferrell also succumbed to her injuries. Ms. Epps, who was the farthest away from the car, survived the accident, but she also suffered serious injuries that required multiple surgeries and extensive physical rehabilitation therapy.

Kanlica testified that after he came to a stop, he observed Anderson's car stopped in the middle of the road; he said that Anderson stayed there for "a while" and then "took off." Kanlica testified that he got out of his car to look at the damage and that a motorist stopped to check on him. Kanlica testified that he left the scene because

he knew there were no other vehicles involved in the accident and he was unaware his vehicle had struck the girls on the sidewalk. However, he soon realized his car was too damaged to drive so he stopped on the side of the road and called his boss, Yagel Amram, who drove to where Kanlica was parked on the side of the road to help him.[3]

Law enforcement eventually arrived at Kanlica's location,[4] and Kanlica told them about the events preceding the accident. Based on the information they received from Kanlica, law enforcement tried to contact Anderson and then went to his apartment when he did not answer their calls. Anderson came to the door and agreed to speak to the officers; one officer described Anderson as "sullen, sad, quiet" and said that Anderson hung his head most of the time they were talking to him. Anderson confirmed that he had locked himself out of his car, that Kanlica had unlocked the car, and that he told Kanlica to follow him to an ATM so he could get cash to pay him. He told police that he banked with SunTrust and that he was looking for a SunTrust ATM, but when questioned, he did not have an explanation for why he had not stopped at any

---

[3] Amram testified at trial that Kanlica told him that he was following Anderson to an ATM and that when Anderson "hit the brakes" he turned the steering wheel and lost control.

[4] Other motorists and emergency personnel responding to the accident site noticed Kanlica's damaged car on the side of the road and called 911.

5

of the SunTrust banks or SunTrust ATM's in the area. He also told police that at some point when he was driving on Barrett Lakes Boulevard, he realized that Kanlica was no longer behind him so he stopped searching for an ATM and drove home. He admitted that he did not make any effort to contact Kanlica to pay him after he disappeared from behind him, and when questioned about whether he had Kanlica's cell phone number, he told police he "thought he might have deleted all the incoming and outgoing calls off his cell phone." Police then placed Anderson under arrest for possible theft of services as well as his possible connection to the accident. Anderson was allowed to call Douglas to pick up his dog before he was transported to jail; the officers testified that when she arrived at Anderson's apartment, she was "disheveled," "extremely upset" and it looked like she had been crying "very recently." Neither Anderson nor Douglas mentioned to police that Douglas had been in the car that day.

Other evidence presented at trial showed that Anderson was very familiar with the area they traveled that day, having lived in that vicinity since 2008. Several witnesses also testified about the number of SunTrust banks and ATM's that Anderson passed after he left the Walmart parking lot. The State also presented evidence from a forensic examination conducted of Anderson's cell phone; this evidence showed that on the night of the accident, someone used Anderson's phone to access a map of the

6

Barrett Lakes Boulevard area where the incident occurred, various local news applications, some of which concerned traffic accidents, and an application that monitors EMS radio communications for Cobb County.

The State's accident reconstruction experts testified that the tire marks and direction of the rotation of the vehicle indicated that Kanlica lost control because of "steering input," and that, while it did not appear to him that speed was a factor, he estimated that Kanlica was driving above the posted speed limit.[5] One of the State's accident reconstruction experts also testified that the evidence was consistent with Kanlica's account of the crash. Kanlica was still talking to the 911 dispatcher when the collision began; when that call was played at trial, the jury heard tires squealing and a loud collision, which was Kanlica's vehicle hitting the curb and the pedestrians before the call disconnects. Kanlica testified that after he hit the curb, his phone fell and the battery came out of his phone so the call disconnected.

Additionally, the State presented extrinsic evidence pursuant to OCGA § 24-4-404 (b). An officer with the Georgia State patrol testified that in October 2012, he observed Anderson driving at a high rate of speed on I-75 southbound near Mount

---

[5] The speed limit on Barrett Lakes Boulevard is 40 miles per hour. However, at the point where the accident occurred, the road curves sharply to the left and there is a caution sign prior to reaching the area advising motorists to slow down to 35 mph.

7

Paran Road; using his speed-detection device, he determined that Anderson was traveling at 87 miles per hour in a 55 miles per hour speed zone. The officer activated his emergency equipment to stop Anderson and as he followed him, he observed Anderson use the emergency lane to pass slower traffic. Anderson was cited for both speeding and driving in the emergency lane for a non-emergency purpose, and the trial exhibits reflect he was adjudicated guilty of both offenses.[6]

Evidence was also presented that in June 2008, an officer with the Blue Ridge Police Department clocked Anderson on a speed-detection device going 74 miles per hour in a 55 mile-per-hour speed zone. Anderson was cited for speeding; he pleaded guilty to that charge.

The State also introduced and played for the jury two videos from Anderson's "Vine" social media account.[7] In one of the videos, Anderson is shown driving down a road while video recording other cars as they pass him; while filming this, he can be heard making comments, apparently to himself, along the lines of "who you trying to race, bro" or "you trying to race bro" or "do you want to race, bro?" In the other video,

---

[6] There is some discrepancy in the record concerning whether Anderson entered a guilty plea or a plea of nolo contendere to those offenses.

[7] Testimony was presented that Vine was a social media application (app) used for the purpose of creating and sharing six-second-long videos.

Anderson is talking about road conditions that make him want to "drift" which, according to the evidence presented at trial, refers to a way of sliding one's vehicle through a turn. The evidence shows that these videos were created in April 2013 and that Anderson deleted them from his phone a few days before trial, after the State filed its notice of intent to introduce them at trial.

Anderson testified in his own defense at trial.[8] He said Kanlica unlocked his car and then gave him a receipt for $175; Anderson said there had been no prior discussion with Kanlica about the fee and that the person he talked to on the phone quoted him a price of between $65 to $69. He said he questioned Kanlica about the fee but after talking to Douglas about it, he told Kanlica to follow him to an ATM so he could get the money to pay him. Anderson detailed his efforts to find a SunTrust ATM and attempted to explain his route and turns as an effort to either find a SunTrust in the area or to double back after he would get a glimpse of a SunTrust sign; he also said he eventually decided to go back to his old apartment and reorient himself from there. Anderson also said that he kept sight of Kanlica until they came to a curve in the road on Barrett Lakes Boulevard, and that at first he just assumed that Kanlica would catch

_____

[8] Taylor Douglas also testified at trial and her testimony was consistent in most respects with Anderson's version of events.

9

up to him at the next red light. He said he waited at the light until it turned green, but when Kanlica did not catch up with him, he assumed Kanlica had decided to go to another job he had mentioned so he proceeded to drive home. Anderson denied he "brake-checked" Kanlica and said the only time he was speeding was when he tried to keep his distance from Kanlica after Kanlica tried to run him off the road on Cobb Parkway, which was before they reached Barrett Lakes Boulevard. He also explained that the reason he was looking at the map of the area and the news applications on his phone was because he wanted to see if something had happened to Kanlica when he disappeared from view.

Anderson also testified that he did not realize that Kanlica was trying to call him while he was following him until he checked his phone when he got home later that night. On cross-examination the State elicited testimony from Anderson that, while he testified that he did not answer Kanlica's calls because he was driving, he checked his voice mail after each call, which he admitted would require more manipulation of his phone than just answering a call. Anderson also testified that it was after he viewed the news app on his phone that he started deleting his incoming and outgoing calls from his cell phone. The State also elicited testimony from Anderson concerning the locations at which he could have obtained funds to pay Kanlica, some of which were

within five minutes of his location at Walmart; he admitted that since it was a Sunday his only option was to use an ATM, casting doubt on his testimony concerning why it was important to him that he go to the SunTrust bank that held his account.

1. Anderson first argues that the trial court erred by allowing the State to introduce extrinsic evidence under OCGA § 24-4-404 (b) ("Rule 404 (b)) of his two prior traffic violations[9] and the two videos he posted on his social media "Vine" account. Specifically, Anderson argues that the State introduced this evidence to establish his propensity, which is not a proper purpose under the statute. See *State v. Brown*, 333 Ga. App. 643, 652 (3) (777 SE2d 27) (2015). "A trial court's decision to admit other acts evidence will be overturned only where there is a clear abuse of discretion." (Citation and punctuation omitted.) *Flowers v. State*, 307 Ga. 618, 621 (2) (837 SE2d 824) (2020).

Under Rule 404 (b), "[e]vidence of other crimes, wrongs or acts shall not be admissible to prove the character of a person in order to show action in conformity

---

[9] Anderson states in his brief that he was not charged with, and did not plead guilty to, any offense other than speeding in connection with the two incidents at issue. However, the officer who issued the citations related to the 2012 violation testified that he charged Anderson with both speeding and using the emergency lane for a non-emergency purpose, and the certified court records introduced into evidence at trial show that Anderson was charged with, and was adjudicated guilty of both offenses.

11

therewith," but such extrinsic evidence "may . . . be admissible for other purposes, including, but not limited to, proof of . . . intent . . . and knowledge[.]" Before such evidence shall be admissible, the party offering the evidence must make three showings:

> (1) that the evidence is relevant to an issue in the case other than the defendant's character; (2) that the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) that there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

*Kirby v. State*, 304 Ga. 472, 479 (4) (819 SE2d 468) (2018). Anderson's challenge to the admission of the evidence focuses on the inquiry required by the first and second part of the test, and we will narrow our review accordingly.

(a) We turn first to the questions of relevancy. The determination of whether evidence is relevant is made by reference to OCGA § 24-4-401, which defines "relevant evidence" as evidence that "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "This is a binary question – evidence is either relevant or it is not." *Strong v. State*, 309 Ga. 295, 300 (2) (a) (845 SE2d 653) (2020).

12

The trial court found that Anderson's speeding convictions and Vine videos were relevant to show the proper purposes of intent and knowledge as to reckless driving, which was charged as the predicate offenses to the vehicular homicide and serious injury by vehicle counts, as well as aggressive driving, which was charged both as a predicate offense and as a separate crime. OCGA § 40-6-390 provides that "[a]ny person who drives any vehicle in reckless disregard for the safety of persons or property commits the offense of reckless driving." As to the offense of aggressive driving, OCGA § 40-6-397 states that "[a] person commits the offense of aggressive driving when he or she operates any motor vehicle with the intent to annoy, harass, molest, intimidate, injure or obstruct another person." The specific act of aggressive driving alleged here was that Anderson "did brake suddenly" while Kanlica was following behind him, and the specific act of reckless driving was that Anderson engaged in a car chase with Kanlica.

As to the introduction of evidence to show intent under the first prong of the Rule 404 (b) test,

> a defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent, which it may prove by qualifying Rule 404 (b) evidence absent affirmative steps to remove intent as an issue. Where the extrinsic offense

13

is offered to prove intent, its relevance is determined by comparing the defendant's state of mind in perpetrating both the extrinsic and charged offenses.

(Citation and punctuation omitted.) *Broadwater v. State*, 359 Ga. App. 87, 92 (2) (a) (854 SE2d 767) (2021).

Knowledge is somewhat similar but not identical to intent. It addition to being relevant when a defendant's knowledge is an element of the charged crime,

knowledge is also properly at issue when the defendant claims that he or she was unaware that a criminal act was being perpetrated. In such cases, the hypothesis justifying the admission of other acts evidence is similar to that invoked with intent: the likelihood that repeated instances of behavior, even if originally innocent, will have resulted in defendant's having the requisite knowledge by the time of the charged crime.

*Green v. State*, 352 Ga. App. 284, 289 (2) (c) (834 SE2d 378) (2019).

We find no abuse of discretion in the trial court's determination of relevancy. As to intent,[10] the State was required to prove that Anderson either intended to engage in

---

[10] We note that even when a particular driving offense does not require a specific intent, "[a] culpable state of mind – intent or criminal negligence – is an essential element of every crime[.]" *Olds v. State*, 299 Ga. 65, 72 (2) (786 SE2d 633) (2016). By entering a plea of not guilty, and in the absence of affirmative steps to relieve the State of its burden, Anderson made intent a material issue. See *Hood v. State*, 309 Ga. 493, 499-500 (2) (847 SE2d 172) (2020).

14

a car chase – as alleged as to the offense of reckless driving – or that Anderson intended to drive in a manner so as to annoy, intimidate, injure or obstruct another person, specifically by suddenly hitting his brakes as Kanlica drove behind him. See *State v. Jones*, 297 Ga. 156, 160 (2) (773 SE2d 170) (2015) (explaining that even when prosecuting general intent crimes, the State must prove the intent to do the acts that make up the crime).[11] Further, Anderson's defense in this case was that he did not have anything to do with Kanlica losing control, that he did not engage in any acts of reckless or aggressive driving, and that any speeding during the course of his interaction with Kanlica was of brief duration and minimal and was done to avoid Kanlica, who he said tried at one point to run him off the road. Thus, as the trial court found, the evidence was relevant to show Anderson's intent to engage in a chase, including driving in excess of the speed limit, or to drive with a conscious disregard of a substantial and unjustifiable risk that his actions would cause harm or endanger the safety of others. The extrinsic evidence was also relevant to show Anderson's

---

[11] Anderson appears to argue that because the intent for the crimes was not the same, the evidence should not have been admitted. It is true that aggressive driving requires a specific intent, see *State v. Ogilvie*, 292 Ga. 6, 8 (734 SE2d 50) (2012), while the intent required for reckless driving "is simply the intent to do the act which results in the violation of the law, not the intent to commit the crime itself[,] *Crossley v. State*, 261 Ga. App. 250, 252 (582 SE2d 204) (2003).

knowledge of traffic regulations – because, as the trial court found, if the jury found that Anderson knew he was breaking the rules of the road by speeding, they could reasonably infer that he was engaged in a car chase, and the same could also be said of driving improperly in the emergency lane to get around other drivers. And the Vine videos were indicative of both his intent to engage in acts of which could constitute the offenses of reckless or aggressive driving – racing and drifting – and his knowledge of aggressive driving techniques, such as how to maneuver a vehicle at high speeds and when negotiating a turn at high speeds. As the trial court found in its order denying Anderson's motion for new trial, in this regard it is also notable that there was evidence presented at trial that Anderson's and Kanlica's vehicles were being driven in excess of the speed limit during the chase and on a curvy road in excess of the speed limit when the crash occurred. Lastly, we note that it was not necessary that all the extrinsic evidence was relevant to intent or knowledge as to both reckless and aggressive driving; so long as it was relevant to one or the other of the charged – or predicate – offenses, the evidence was admissible. *Hood v. State*, 309 Ga. 493, 500 (2) (847 SE2d 172) (2020).

(b) The second part of the test is governed by OCGA § 24-4-403. Under that section,

16

[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.[12]

The weighing of evidence under OCGA § 24-4-403

must be done on a case-by-case basis and requires a common sense assessment of all the circumstances surrounding the extrinsic act and the charged offense. These circumstances include the prosecutorial need for the extrinsic evidence, the overall similarity between the extrinsic act and the charged offense, and the temporal remoteness of the other act.

(Citation and punctuation omitted.) *Frazier v. State*, 309 Ga. 219, 226-227 (2) (845 SE2d 579) (2020).

The application of the balancing test under OCGA § 24-4-403 is a matter committed principally to the discretion of the trial courts but, as has been repeatedly noted by our appellate courts, the exclusion of evidence under that section is an extraordinary remedy which should be used only sparingly. See, e.g., *Olds v. State*, 299 Ga. 65, 70 (2) (786 SE2d 633) (2016). "In reviewing issues under [OCGA § 24-4-403]

---

[12] Anderson argues only that the probative value of the evidence was substantially outweighed by the risk of unfair prejudice, and we will narrow our review accordingly.

we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." (Citation and punctuation omitted.) *Mike v. State*, 358 Ga. App. 113, 118 (3) (b) (853 SE2d 887) (2021). "To determine whether evidence is more probative than prejudicial, our Supreme Court has explained that, generally speaking, the greater the tendency to make the existence of a fact more or less probable, the greater the probative value." (Citation and punctuation omitted.) Id. at 117 (3) (b).

Here, the prosecutorial need for the evidence was high to counter Anderson's defense that he had not been in a car chase with Kanlica and nothing he did caused Kanlica to lose control. Anderson testified that any speeding on his part was brief and precipitated by a need to stay away from Kanlica after Kanlica tried to run him off the road, and Anderson attributed any unusual driving maneuvers to his efforts to locate an ATM. The State's evidence, however, showed that Anderson engaged in acts that could constitute the offenses of both reckless driving and aggressive driving – such as signaling a turn and then turning in the opposite direction, zig-zagging in and out of traffic, speeding on a curvy road, swerving in front of Kanlica and then applying his

brakes while navigating a curve in excess of the speed limit.[13] Thus, the prosecutorial need in this case was substantial. See *Frazier v. State*, 309 Ga. at 226 (2) (prosecutorial need high to counter defense that defendant had been coerced into participating in the crimes); *King v. State*, 338 Ga. App. 783, 787 (792 SE2d 414) (2016) (need for extrinsic evidence – prior DUI – heightened where defense was that defendant did not drive the vehicle while intoxicated).

Anderson makes no argument concerning the temporal remoteness of the evidence;[14] instead he argues that there was no "no correlation to the facts in evidence." It is true that there was no precise similarity between the extrinsic acts and the specific acts of aggressive and reckless driving as alleged in the indictment. However, "when other act evidence is introduced to prove intent, a lesser degree of similarity between the charged crime and the extrinsic evidence is required."(Citation and punctuation omitted.) Frazier, 309 Ga. at 227 (2). Although the videos referred to racing and

---

[13] Although the State's expert opined that speed was not a factor in Kanlica losing control, he also testified that Kanlica was speeding at the time of the accident, and Kanlica testified that Anderson was going in excess of the speed limit.

[14] We note, however, that none of the extrinsic evidence was so remote in time "as to be lacking in evidentiary value." (Citation and punctuation omitted.) *Kirby,* 304 Ga. at (4) (a) (i). The Vine videos were posted in April 2013, just over 12 months prior to the date of the charged offenses, and the speeding violations occurred in 2012 and 2008.

19

drifting, these acts are consistent with the acts of reckless and aggressive driving – chasing and brake checking – Anderson engaged in while he was eluding Kanlica. Regarding the speeding violations, in both instances Anderson was driving at a high rate of speed and during one violation he used the emergency lane to pass slower drivers. These violations were consistent with an intent to drive with a reckless disregard for the safety of others, and the act of using the emergency lane could also be viewed as an act of reckless or aggressive driving.

On the other side of the equation, the risk of prejudice was minimal. The extrinsic evidence was not particularly disturbing and there is "nothing in the testimony [that] would shock the average juror or otherwise render the jury incapable of weighing the evidence in a disinterested manner" and "nothing inherent in this evidence that would create a risk that [Anderson] would be convicted on a ground different from proof specific to the offense charged[.]" *Smart v. State*, 299 Ga. 414, 419 (2) (a) (788 SE2d 442) (2016).

Additionally, prior to the presentation of the evidence, the trial court gave a limiting instruction advising the jury that the other acts evidence was being admitted for the limited purposes of showing intent and knowledge. The trial court also admonished the jury "to consider the evidence only insofar as it may relate to those

issues and not for any other purpose [and] not to infer from such evidence that the Defendant is of a character that would commit such acts." As our appellate courts have previously recognized, limiting instructions such as these act to further mitigate the prejudicial impact of Rule 404 (b) evidence. *Mike*, 358 Ga. at 118 (3) (b). In sum, we discern no abuse of discretion in the admission of the Rule 404 (b) evidence in this case, and Anderson is not entitled to a new trial on this basis.

2. Anderson also contends that the trial court erred by refusing to allow him to introduce evidence that in 2013, Kanlica had attempted to abduct a teenage girl from a bus stop and then attempted to flee, arguing that such evidence was relevant to show motive and intent. This contention is without merit.

During a pre-trial hearing, Anderson's trial counsel argued the evidence of the alleged attempted abduction was admissible under Rule 404 (b) to show bent of mind and propensity, specifically to show Kanlica is dangerous and heartless to children.[15] The trial court properly rejected these efforts, finding that propensity and bent of mind are no longer proper purposes for which other acts evidence can be admitted. See *Olds v. State*, 299 Ga. at 69, n.6; *Jones*, 297 Ga. at 159.

---

[15] The transcript from the hearing on this evidence reflects that Kanlica entered a plea to a charge of simple battery related to the incident.

At the hearing on the motion for new trial and now on appeal, Anderson urges that this evidence should have been introduced to show Kanlica's motive and intent to steal and his intent to flee. He argues that Kanlica's intending to "steal a child made it more probable he intended to steal from Anderson when he unlocked his car." Further, he argues that the evidence is also relevant as to the issue of flight since he fled from the scene during both the prior act and after he struck the victims with his car in this case. Because Anderson did not advance these arguments at the time he first sought to introduce the evidence, the State contends that we should review his claim only for plain error. However, we find it unnecessary to analyze this issue under the plain error standard because Anderson has failed to show error, much less plain – clear and obvious – error, due to the exclusion of the evidence.

As stated above, relevant evidence is defined in OCGA § 24-4-401 as evidence that "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Even accepting Anderson's far-fetched and imaginative argument that attempting to "steal" a child and attempting to charge someone too much for services are indicative of the same motive and intent, whether Kanlica attempted to overcharge Anderson did not "hav[e] any tendency to make the existence of any fact *that is of*

*consequence to the determination of the action* more probable or less probable than it would be without the evidence." Anderson did not make any claim that his actions were an attempt to elude Kanlica because Kanlica had overcharged him; instead, Anderson maintained that up until the point where Kanlica disappeared from view, he was attempting to locate an ATM so he could pay Kanlica. Thus, whether or not Kanlica attempted to overcharge Anderson is of no consequence to the determination of the issues in this case.

The issue of Kanlica's alleged flight from the scene was also was not at issue in this case. Kanlica admitted that he left the scene of the accident and had pleaded guilty to charges of vehicular homicide and serious injury by vehicle by the time Anderson was tried. The issue for determination was not whether Kanlica left the scene of the accident; rather, the issue was whether Anderson caused the accident by brake checking Kanlica, causing him to lose control. And even if there may have been some slight relevance to the issue of flight, we have little hesitancy in concluding that the probative value of such evidence was substantially outweighed by the risk of prejudice. Evidence that Kanlica attempted to kidnap a teenager from a bus stop was clearly the type of conduct that would inflame the passions of the jury and "render them incapable

of weighing the evidence in a disinterested manner[.]" *Smart*, 299 Ga. at 419 (4) (b). Accordingly, this enumeration of error is without merit.

3. Anderson argues that the trial court erred by denying his motion to strike Kanlica's trial testimony after Kanlica refused to testify at the hearing on Anderson's motion for new trial.

The transcript of the second hearing on Anderson's motion for new trial shows that Anderson planned to call Kanlica to testify at the hearing, but Kanlica invoked his Fifth Amendment right against self incrimination and refused to testify. After ascertaining that Kanlica had a pending appeal in his own criminal case, the trial court upheld Kanlica's right to assert the privilege. Anderson then moved to strike Kanlica's trial testimony, arguing that his testimony at the motion for new trial hearing should be treated as a continuation of his trial testimony, and that Kanlica's refusal to testify at the hearing resulted in a denial of Anderson's right to cross-examine the State's witnesses against him. The trial court refused to strike the testimony. We find no error.

Anderson cites no authority, and we have round none, for the proposition that a witness' *trial* testimony, which included a thorough and sifting cross-examination, should be stricken when the witness refuses to testify at a subsequent hearing. Further, although Anderson apparently intended to question Kanlica about statements he

24

allegedly made to his cell mate, Alan Carlton, to the effect that the accident occurred because he dropped his cell phone, any testimony along these lines would merely have been impeaching of Kanlica's trial testimony and would not have warranted the grant of a new trial. See *Wimberly v. State*, 302 Ga. 321, 326-327 (2) (806 SE2d 599) (2017); *Lewis v. State*, 301 Ga. 759, 762 (2) (804 SE2d 82) (2017).[16] Moreover, the audio recording of Kanlica's call to 911 was played for the jury at trial, and the jury heard for themselves that the accident occurred while Kanlica was talking to the 911 operator, wholly discrediting Anderson's proffer that Carlton would have testified that Kanlica told Carlton he lost control while trying to retrieve his cell phone after he dropped his cell phone while he was attempting to call 911. Anderson is not entitled to a new trial on this basis.

4. In related enumerations of error, Anderson contends the trial court erred by refusing to allow Carlton to testify at the motion for new trial hearing about the statements Kanlica allegedly made to him, which, he contends, violated his federal and

---

[16]An exception to the general rule that a post-trial recantation or impeaching testimony will not warrant a new trial can be found "where there can be no doubt of any kind that the State's witness' testimony in every material part is purest fabrication . . . that is, when the witness' testimony is shown to be an impossibility." *Lewis*, 301 Ga. at 762 (2). As the *Lewis* court went on to explain, "[t]hat exception is met when the witness' testimony is shown to be an impossibility." Id. at 762-763 (2). The "proffered" testimony in this case falls far short of such a showing.

state constitutional rights to cross-examine and confront the witnesses against him. Again we find no error.

The transcript of the hearing shows that Carlton sent two letters, styled as "Notices," to the District Attorney's office, the trial judge, and the Clerk of the Superior Court that stated that Carlton had information of an exculpatory nature, namely that Kanlica had fabricated his testimony at trial. The letters also suggested that the State had withheld this information, resulting in a potential *Brady*[17] violation. The trial court denied Anderson's request to question Carlton, finding that, as to the alleged *Brady* violation, the "Notices" were a matter of public record, and that Carlton's testimony was inadmissible hearsay. Again, we find no error.

First, as to the alleged *Brady* violation, Anderson has made no showing on appeal that the trial court erred by finding that the Notices sent by Carlton were a matter of public record[18] and makes no argument to support the contention that a *Brady* violation in fact occurred. Accordingly, we will not belabor this contention.

---

[17] *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963).

[18] The trial court's order denying the motion for new trial recites that the first Notice was filed with the clerk of court on October 6, 2015, more than 10 days before Anderson's trial.

Further, the motion for new trial hearing hearing shows that before the trial court ruled on the admissibility of Carlton's testimony, Anderson's appellate counsel attempted to make a proffer of his testimony since the "Notices" Carlton sent to the various court officials stated only that he had "exculpatory," information that Kanlica "fabricated" his testimony. Anderson's counsel stated at the hearing she had no idea what Carlton's testimony would be because when she spoke to him on the telephone, Carlton told her he would not reveal that until he testified at the hearing; however, she stated that she had been told by unidentified third parties Kanlica told Carlton the accident occurred because he dropped his cell phone while he was trying to call 911 and was distracted when he was trying to retrieve it.

Further, there is no merit to Anderson's contention that Kanlica's statements to Carlton should have been treated as an admission by a party opponent and thus admissible pursuant to OCGA § 24-8-801 (d) (2) (A).[19] The State, not Kanlica, was the party opponent in this case, and because Kanlica had pleaded guilty and was not tried with Anderson, he was not a party to the case at all. See *United States v. Pacchioli*, 718

---

[19] OCGA § 24-8-801 (d) provides in relevant part: "(2) **Admissions by a party-opponent**. Admissions shall not be excluded by the hearsay rule. An admission is a statement offered against a party which is: (A) The party's own statement, in either an individual or representative capacity[.]"

F3d 1294 (11th Cir 2013).[20] Anderson's reliance on *Virger v. State*, 305 Ga. 281 (824 SE2d 346) (2019), is misplaced; in that case, the State – the party opponent – used a statement made by a defendant against that defendant. The trial court did not err by refusing to admit Carlton's testimony about what Kanlica allegedly told him under OCGA § 24-8-801 (d) (2) (A).

Kanlica's alleged statement to Carlton also was not admissible pursuant to OCGA § 24-8-804 (b) (3), which allows admission of statements against interest in specified circumstances. However, if the statement is offered in a criminal case and is such that it would tend to expose the declarant to criminal liability, a showing must be of "corroborating circumstances that clearly indicate the trustworthiness of the statement[.]" Id. The motion for new trial transcript shows that Anderson's attorney based her proffer on the information provided to her by unnamed third parties, Carlton never disclosed to Anderson's attorney what Kanlica allegedly said to him, and nothing was disclosed on the record about the circumstances surrounding the making of the statement. The "Notices" authored by Carlton were not specific as to the alleged out-of-court statement and seemed in large part designed to cast aspersions on the District

---

[20] "Because OCGA § 24-8-801 (d) (2) (A) is essentially identical to its federal counterpart, we look to decisions of the federal appellate courts for guidance in its application." *Reed v. State*, 307 Ga. 527, 536 (2) (c), n.8 (837 SE2d 272) (2019).

Attorney's office and court officials. Because Anderson made no effort to establish the trustworthiness of the alleged statement, the trial court did not abuse its discretion by refusing to admit the statement under OCGA § 24-8-804 (b) (3).

Further, even if the trial court erred by finding that Carlton's testimony was inadmissible hearsay, as explained in Division 3, Anderson has nevertheless failed to show that the trial court erred by denying his motion for new trial. The 911 call played for the jury belied any purported testimony that Kanlica said he dropped his cell phone while he was attempting to make a 911 call since he was talking to the 911 operator when the crash occurred. Further, also as explained in Division 3, any testimony in that regard was merely impeaching of Kanlica's trial testimony and would not have warranted the grant of a new trial.

*Judgment affirmed. Miller, P. J., and Hodges, J., concur.*